UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FRANCHATA A. BUSH,        )
                          )
        Plaintiff,        )
                          )
    v.                    )        Case No. 3:05-0019
                          )        Judge Echols
                          )
GAMBRO HEALTHCARE, INC.   )
                          )
        Defendant.        )

**MEMORANDUM**

Pending before the Court is the Motion for Summary Judgment
(Docket Entry No. 51) filed by Defendant Gambro Healthcare, Inc.
("Gambro").   Plaintiff Franchata A. Bush ("Bush") has filed a
response in opposition to that motion (Docket Entry Nos. 61 and 64)
to which Gambro has filed a reply (Docket Entry No. 79).

**I.  FACTS**

Plaintiff asserts many claims against Defendant based upon
assorted incidents which occurred during her employment.[1]  After a
general overview, the Court will discuss the facts relevant to each
incident under separate headings.

**A.  General Factual Allegations and the First EEOC Charge**

Bush, an African American female, filed this suit against her
employer Gambro alleging that it violated Title VII, 42 U.S.C.
2000e *et seq.*, 42 U.S.C. § 1981, and the Tennessee Human Rights Act

---

[1]The parties have presented the Court with numerous statements
of "undisputed" facts.  Bush has presented the Court with 106
paragraphs of such facts and Gambro has presented 54 paragraphs of
such facts.  Many of the proffered facts are not material.

1

("THRA"), T.C.A. § 4-21-401 *et seq.* Bush alleges in Count I that she was discriminated against on the basis of race in violation of Title VII and the THRA. In Count II, Bush claims race discrimination in violation of 42 U.S.C. § 1981. Bush claims in Count III[2] that she was retaliated against for engaging in protected activity in violation of Title VII and the THRA. Finally, in Count IV, she claims that she was subjected to a hostile work environment on account of her race in violation of all three statutes. (Docket Entry No. 1, at 6-13).

Since January of 2002, Bush has been employed as a Patient Account Representative ("PAR") in Gambro's Reimbursement Department at its facility in Brentwood, Tennessee. (<u>Id</u>. ¶ 11). Gambro is a provider of healthcare services in the area of kidney dialysis treatment and its facility in Brentwood houses a Reimbursement Department that performs billing and collection activities for 120 dialysis clinics in three of the company's twelve regions. (Def. SOF ¶ 1).

In the Reimbursement Department, each of the three Regional Reimbursement Managers ("RRM") oversees a team comprised of an Assistant Regional Reimbursement Manager ("ARRM"), several PARs, Regional Reimbursement Specialists ("RRS"), Patient Referral Coordinators ("PRC"), and file clerks. (<u>Id</u>.). The RRMs report to the Director of Reimbursement. (<u>Id</u>.).

---

[2]Actually, the Complaint has two counts which are labeled "Count III." For ease of reference, the Court will denominate the second Count III, which alleges a hostile work environment, as Count IV.

The duties of a PAR include initiating collection follow-ups on unpaid claims, submitting claims to payers (such as Medicare), communicating with insurance companies regarding claims, resolving insurance underpayment and denials, maintaining working relationships with clinics, and performing other assigned duties. (<u>Id</u>. ¶ 5).

On September 3, 2003, Bush filed an EEOC charge against Gambro ("First EEOC Charge"). That charge was settled during mediation and the confidential settlement resolved all employment disputes between the parties as of the date of its execution. (<u>Id</u>. ¶ 6).[3] Since that time, Plaintiff has filed three other EEOC charges which serve as the basis for the present lawsuit.

**B.    The ARRM Position and the Second EEOC Charge**

On March 10, 2004, Gambro posted an opening for an ARRM position. Dan Hunter ("Hunter"), Bush's RRM and the manager who would supervise the ARRM position, was charged with conducting the selection process with the assistance of Peggy Beyer ("Beyer"), the Director of Reimbursement at Brentwood to whom Hunter reported. (Def. SOF ¶ 7). Both Hunter and Beyer claim that at the time, neither was aware of Bush's First EEOC Charge or related internal complaints Bush had filed against Gambro. (<u>Id</u>; Hunter Aff. ¶ 7).

Bush applied for the ARRM position on the day it was posted, and was one of the seven candidates selected for interviews: four

---

[3]Bush does not dispute that the claims were settled amicably, only that she found the conduct of counsel for Gambro during the meeting so offensive as to warrant a charge of unethical behavior with the Georgia State Bar. (Pf. Res. to Def. SOF ¶ 6).

internal and three external. Hunter asked each applicant to complete pre-interview questionnaires and conducted the interviews March 16-26, 2004. After the interviews, Hunter selected one internal and one external applicant (both of whom were white) for a second round of interviews with Beyer. Hunter did not select Bush. Beyer and Hunter agreed that Ann Stepanek ("Stepanek"), the external candidate, was the more qualified and should be hired. (Def. SOF ¶ 9).

The position of ARRM required a high school diploma, a proven track record of at least three years in accounts receivable, five to eight years of progressive healthcare reimbursement experience, the ability to handle an "extensive multi-task position," a demonstrated ability to complete work on one's own, and excellent verbal and written communication skills. Given the nature of the job, the AARM position required the ability to properly understand billing. Additionally, personnel management experience was preferred. (Docket Entry No. 53, Ex. J; Pf. SOF ¶ 117).

Stepanek has a high school education and her qualifications included years of management experience[4] and more than fourteen years of healthcare experience (including some managerial experience) relative to billing and collections in the healthcare field. (Def SOF ¶ 11 and Pf. Resp.; Pf. SOF 56). Hunter believed that Stepanek's questionnaire and interview answers indicated solid

---

[4]Gambro asserts that Stepanek had over eleven years of management experience, while Bush claims it was seven years of such experience. (Def SOF ¶ 11 and Pf. Resp.)

communication, and managerial and leadership skills to solve problems efficiently, motivate staff, and train employees. Hunter was also personally familiar with Stepanek's leadership skills, having worked with her at Premier Medical Group as her supervisor for approximately two years. (Hunter Aff., Ex. I, ¶ 10).

In contrast, Bush has a Bachelor of Science degree in Healthcare Administration (which included courses in health care finance) and a Certificate in Healthcare Administration. (Pf. SOF ¶¶ 117-118). Bush's managerial experience was limited to less than a year when she was an account manager for a temporary placement firm where she recruited and placed employees. As for accounts receivable experience, while Bush was very successful (having collected over $44 million in revenues) and received favorable performance evaluations, she only had four and one-half years, two of which were as a PAR at Gambro. (Docket Entry No. 53, Ex. M at 7-8; Bush Depo. at 48-51; Pf. SOF ¶¶ 81-82). Hunter considered Bush's written communication skills average and her responses to job-related experience vague and general. Hunter believed that Bush had the task-oriented mentality of a strong PAR, but he did not think she had the leadership qualities of a manager. (Hunter Aff. ¶ 11).

Hunter offered Stepanek employment and she began on April 19, 2004. He met separately with each interviewed candidate, including Bush, to inform them of his decision. (Def. SOF ¶ 15).

Bush did not believe Stepanek was qualified for the position and evidenced her lack of knowledge by having to ask Bush work-

5

related questions. (Docket Entry No. 53, Ex. N & Bush Depo. at 233-239).[5] On May 24, 2004, Bush filed EEOC Charge No. 253-2004-02278 ("Second EEOC Charge"), alleging that she was not selected for the ARRM position because of her race and in retaliation for having filed the First EEOC Charge. Since at least September, 2002, to the present, Gambro has not promoted any of its African American employees to a management position over PARs. (Pf. SOF ¶ 58).

C. **The Medicare Incident**

On Friday, July 9, 2004, an electronic Medicare system error rejected over 30,000-month-end billing claims submitted by Gambro and involved all Gambro locations and all PARs similarly situated to Bush. The error involved over fifty-three million dollars in submitted bills. The problem came to the attention of Stepanek and at some point around 8:00 a.m. Sheila Clingerman ("Clingerman"), the Electronic Data Interchange Manager, became aware of the problem. (Clingerman Aff. ¶¶ 2-3, Docket Entry No. 53, Exs. O & P).

Bush and other PARs discussed the Medicare problem and one of those PARs, Anjee Hart, called Medicare and was told to resubmit the claims using "F9." After that instruction was reported to other PARS, some of them (including Bush) also called Medicare to confirm the procedure. (Def. SOF 18 and Pf. Resp.). At 8:15 a.m.,

---

[5]For example, Stepanek asked Bush to help her understand an Explanation of Benefits form, which is regular correspondence in the healthcare collections industry. (Pf. SOF ¶ 126).

6

Bush sent an email to her managers (Hunter and Stepanek) and managers outside her group informing them of the procedure suggested to her by Medicare - to resubmit all claims and "F9" them. Bush did not attempt to discuss this in person with Stepanek or any other manager.

In an e-mail sent at 8:43 to Bush, Beyer, Hunter and others, Clingerman indicated that Medicare had told her it was unsure if "F9" would correct the issue and that instead, a few of the claims should be resubmitted via "F9" to see if they went through. At 11:10, Bush responded insisting that they had been told by Medicare that the only way to get the claims paid is by "F9" and that, while it would be understandable to send a few that way and wait a couple of hours to see if the claims were rejected, prolonging the process would only hurt the timeliness of reimbursement. Shortly thereafter, Bush sent an e-mail to Clingerman, Hunter, Stepanek, and some PARs indicating that Medicare was working on the claims which had been submitted through the "F9" process. Clingerman responded by recognizing Bush's hard work but asking her in the future not to directly send out such e-mails but to discuss it with her RRM or ARRM so that the managers could coordinate their response and so that there would not be conflicting information sent around. Clingerman and Bush then exchanged a couple of more e-mails in which Bush stated she was not trying to give out incorrect information, and Clingerman stated that everybody needed to be on the same page and Bush needed to follow protocol. (Docket Entry No. 53, Ex. R).

On July 13, 2004 Bush submitted an internal complaint to the Human Resources Department alleging that Clingerman attacked her credibility, "became hostile" and called Bush a "liar" in her e-mails of July 9th.  Monica Alexander ("Alexander"), the Human Resources Manager at the Brentwood facility, met with Bush the day after Bush submitted her complaint and asked Bush for the full details of her claims against Clingerman.[6] (Def. SOF ¶ 29).

Alexander scheduled a meeting for July 23, 2003, with Bush, Beyer, and Hunter.  Alexander determined that this meeting between Bush and her "chain of command" was important to communicate the outcome of the investigation and to reinforce the concept that, while the Company appreciated Bush's interest in resolving the Medicare problem, in the future she should refer such problems to her managers.  However, at Bush's request, the meeting occurred with just Alexander and Bush present.  (Def. SOF ¶ 32).

Alexander claims that during the meeting she explained to Bush that after an investigation into the events of July 9, 2004, Gambro found that Clingerman had not engaged in any inappropriate conduct and that Bush should follow the chain of command in the future. (Alexander Aff. ¶ 11).  For her part, Bush claims that during the meeting, Alexander said she knew who Bush was (even though this was the first time they had met) and asked Bush about the status of her Second EEOC Charge which was scheduled for upcoming mediation.

---

[6]Clingerman knew nothing of Bush's EEOC charges or internal complaints until Bush filed her internal grievance and Gambro was required to investigate and notify Clingerman that a complaint had been filed against her. (Def. SOF ¶ 31).

8

Alexander also allegedly asked Bush why she had filed EEOC charges and Bush responded that the filings were necessary because black employees had consistently been passed over for promotion and because of the way she had been treated. (Bush Aff. ¶ 27). At some point during the meeting Bush asked Alexander to see an e-mail Alexander was reading whereupon Alexander slammed the e-mail down on her desk in front of Bush. (Pf. SOF ¶ 134).

A subsequent meeting on the Medicare incident was held with Hunter, Beyer, and Bush on July 29, 2004. According to Hunter, he told Bush he thought she should have discussed the matter with Stepanek instead of sending out the e-mails to managers and other PARs so that Stepanek could decide how to handle the situation. (Docket Entry No. 53, Ex. W). Hunter claims the meeting ended when Bush insisted that someone else be present, preferably from Human Resources. (Id.). Bush claims that while she did request that the meeting be adjourned until someone from Human Resources could be present, the meeting ended because Beyer's behavior during the meeting caused Bush to have a panic attack which required treatment in an emergency room.[7] (Bush Aff. ¶ 33).

In her deposition, Bush admitted that she was never disciplined for the Medicare incident, (Bush Depo. at 359), although she now claims that the meeting in Hunter's office with

_____

[7]Beyer, who was sitting next to Bush, allegedly raised her voice and stated "Let me get this straight, your manager said you acted inappropriately, and you said you felt you did nothing wrong" whereupon Beyer clapped her hands and shouted at Bush "you do the math." (Bush Aff. ¶ 33).

Beyer on July 29, 2004 constituted a "verbal reprimand" since she was told by Hunter that she should have communicated with Stepanek about the Medicare incident. (Def. SOF 41 & Pf. Resp.).

Ultimately, Gambro successfully collected the revenue associated with the Medicare incident, albeit with some delay. PARs who did not resubmit their claims as instructed by Medicare did not receive bonuses they ordinarily would have received. (Pf. SOF ¶¶ 98-99).

**D.  Use of Gambro's Computers and the Third EEOC Charge**

Gambro has a Human Resource policy regarding use of the company's computers. Bush was aware that, under the policy, the computers and software were to be used only for business purposes and that Gambro had the right to access her computer. Bush also agreed to report any activity which she believed violated the policy. (Def. SOF ¶ 4).

Between August 11 and 19, 2004, Bush, using Gambro's e-mail system, communicated with her then-attorney, David Danner, over 20 times regarding Bush's claims against Gambro. (Docket Entry No. 53, Ex. X).[8]  Bush also used Gambro computers to work on numerous personal school projects, including PowerPoint presentations, research papers, a survey, a presentation on strategic planning for healthcare organizations, an assignment on research methods, a presentation on financial management, a case study critique, and an

---

[8]In those e-mails, Bush indicated she was considering filing a third EEOC charge regarding the Medicare incident but was counseled against doing so because she had not suffered an adverse employment action. (Id.).

10

exam. (Def. SOF 36). Bush also used Gambro computers to work on numerous letters and documents for such things as a school Parent Advisory Committee, her Homeowners Association (of which Plaintiff was President), interrogatory responses for her husband in a personal injury lawsuit, her husband's resume, and letters for friends. (Def. SOF ¶ 37).

Bush has produced some e-mails from various co-workers which suggest non-business use of Gambro computers for such things as placing catalog orders, buying sandwiches, and requesting that employees volunteer for a research project for a school assignment. (Docket Entry No. 53, Exs. PP, RR). Bush has also identified Michelle Conviser ("Conviser") as someone who used Gambro computers to communicate with a lawyer. The record shows that Bush sent an e-mail to Conviser asking Conviser for her divorce lawyer's name. Conviser responded with a name and information on how to get in touch with the lawyer.[9] (Def. SOF ¶ 51 and Ex. NN). However, Bush has produced no evidence that any other employee utilized his or her Gambro computer for non-business related matters to the extent that Bush used her work computer for personal matters.

On September 10, 2004, Clarkston Hines, Gambro's Human Resources Vice President, participated by telephone in a meeting between Bush, Alexander and Hunter. According to Bush's own meeting notes, she was told that it had been brought to management's attention that Bush had been using Gambro computers

---

[9]Bush did not report Conviser to management for Conviser's email exchanges with her lawyer.

for "outside business," that Gambro wanted to make sure its work was being done, that everyone would be held accountable for personal use of the company's computers, and that her computer would be monitored. Her notes also reflect that during the conversation, Hines indicated that, while he was disappointed Bush sought outside legal advice, this was America and it was her right to pursue her legal claims. (Docket Entry No. 53, Ex. EE).

After the meeting with Hines, Bush did not receive a Corrective Action Form or any other written disciplinary document that she had to review or sign. The meeting was not recorded in Bush's personnel file, although Hunter did keep a copy of his notes in his files, but he claims the notes were never used in any decision making process regarding Bush. (Hines Decl. ¶ 10).

Bush maintains that some time earlier, Hines had come to the Brentwood facility to discuss personnel matters with the employees and had told them that employees could use their company computers for personal use during break times and that Bush could use her computer to communicate with her lawyer about her case during her break times. (Bush Aff. ¶ 41). Bush is unaware of any other employees who had their computer use monitored or who were reprimanded by Gambro for improper computer use. (Pf. SOF ¶ 105).

On October 7, 2004, Bush filed her third EEOC charge (Charge No. 253-2005-00046) ("Third EEOC Charge"), alleging race discrimination and retaliation. Specifically, Bush complained that: (1) Sheila Clingerman harassed Bush over the Medicare incident because of Bush's race, which created a racially hostile

work environment; (2) that on July 29, 2004, she was disciplined about the Medicare incident; (3) that her complaints to management regarding the situation were met with resistance; and (4) that during the meeting about the alleged violation of the company's computer policy, Bush was told she was violating company policy by using Gambro equipment for personal use and that the company would have preferred she had filed an internal complaint before filing her Second EEOC Charge. (Def. SOF 41).

**E.  The Featherston Incident and the Fourth EEOC Charge**

On February 24, 2005, Tyronda Featherston ("Featherston"), an African-American PAR, complained to Penny Gammon, her supervisor and an ARRM, that while Featherston was in the company mailroom, Bush walked in and called her a "rat" and a "bitch." Featherston then personally reported the incident to Alexander and filed a Harassment Report against Bush. (Docket Entry No. 53, Ex. GG). Alexander interviewed the only third-party witness to the incident, Stacy Dowlen, an African-American Mailroom Supervisor who confirmed Featherston's account of the facts. (Id., Ex. HH).

The following morning, February 25, 2005, Alexander and Beyer met with Bush to discuss the incident. During that meeting, Bush was given an opportunity to tell her side of the story. Bush admitted to saying in the mailroom that she "smelled a rat," to which Featherston replied "yea, and it's leaving," but Bush denied calling Featherston a "bitch." (Id., Ex. JJ, II; Bush Depo. at 504-505; Pf. SOF ¶ 114).  Alexander placed Bush on administrative leave pending the outcome of the investigation and invited Bush to call

13

her if she had any additional information she wanted Gambro to consider during its investigation. (Id.).

Bush asked Alexander to interview Toni Lee, who had not witnessed the incident. According to Bush, Lee had knowledge regarding Bush's relationship with Featherston. Alexander accommodated Bush's request and, as part of her investigation, interviewed Lee. Lee did not provide any information regarding the relevant incident. Lee, however, described Bush as a "fighter for all lost causes" and even gave an example of an occasion on which Bush urged Lee to complain to Gambro managers about a situation that Lee herself did not perceive as problematic. Lee finished the interview by saying that she did not understand why Gambro had come to talk to her, as she was friends with both Featherston and Bush. (Def. SOF ¶ 46).

Mark Bishop ("Bishop"), Gambro's Senior Vice President of Human Resources, responded to an e-mail from Bush explaining that her initial suspension was not meant to be punitive, but rather was done to allow for an investigation into Featherston's allegations. Bishop also invited Bush to give Alexander any additional information regarding other employees not being treated similarly under similar circumstances. Bush claims she informed Alexander that she should talk to Carrie Transley who, although she was not a witness to the incident, could confirm that Featherston was disrespectful and engaged in abusive behavior towards Gambro

14

employees.[10]  Alexander did not interview Transley.  (Def. SOF 47 and Pf. Resp).

Prior to Bush's return from suspension, Alexander mailed her a Corrective Action Form which outlined Gambro's findings that Bush had engaged in misconduct and which converted Bush's administrative leave into a disciplinary suspension without pay. (Docket Entry No. 53, Ex. II). Beyer and Alexander met with Bush after her return to work to discuss the Corrective Action Form.  At the end of the meeting, Bush said she would not sign the Corrective Action Form and instead handed Alexander another EEOC charge, No. 253-2005-01225 ("Fourth EEOC Charge) against Gambro. (Id., Bush Depo. at 523-524, Alexander Aff. ¶¶ 25-26).

The Fourth EEOC charge alleged that, as a result of the Featherston incident, Bush had been treated differently than fellow co-workers because of her race and in retaliation for having filed previous EEOC charges.  (Docket Entry No. 53, Ex. MM).  Bush admits, however, that she is not aware of any white employees at Gambro who were treated better than she was after engaging in conduct similar to the one in which she was accused by Featherston. (Def. SOF ¶ 50).

## II.  **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for

---

[10]According to Bush, Featherston has a history of engaging in offensive behavior towards Transley, including following her home from work and making harassing phone calls to her home.  (Pf. SOF 116).

15

trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

16

### III.  ANALYSIS

Bush brings her claims under Title VII, the THRA, and 42 U.S.C. § 1981.  The same basic analytical framework is used in evaluating claims under all three statutes.  See, Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004)("[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981)"; Gee-Thomas v. Cingular Wireless, 324 F.Supp.2d 875, 881 (M.D. Tenn. 2004)("analysis of claims under the THRA is the same as under Title VII").

A claim of discrimination may be established either by the introduction of direct evidence of discrimination, or by circumstantial evidence from which an inference of discrimination may be drawn.  Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003).  Bush asserts that both types of evidence exist with respect to some of her claims in this case.

### A.  RACE DISCRIMINATION - FAILURE TO PROMOTE (COUNTS I & II)

Bush claims she was subjected to racial discrimination in violation of Title VII, the THRA, and Section 1981 because of Gambro's failure to promote her to the position of ARRM.  She also claims in her brief that, on two different occasions, she was not promoted to the position of Contract Administrator on account of her race.  With regard to her failure to promote claims, Bush offers no direct evidence and relies, instead, upon circumstantial evidence in an attempt to establish her claims.

17

To establish a *prima facie* case of racial discrimination based on a failure to promote utilizing circumstantial evidence, "a plaintiff generally must demonstrate that: (1) [s]he is a member of a protected class; (2) [s]he applied and was qualified for a promotion; (3) [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." <u>Dews v. A.B. Dick Co.</u>, 231 F.3d 1016, 1020-1021 (6th Cir. 2000). If plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision, with the plaintiff then bearing the burden of showing that the defendant's proffered reason is pretextual. <u>Id</u>. at 1021. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." <u>Id</u>.

### 1. <u>ARRM Position</u>

Bush claims she was discriminated against when Stepanek was chosen for the position of ARRM. Although Hunter stated he did not believe Bush was qualified for the ARRM position because she lacked managerial experience and leadership skills, Defendant concedes Plaintiff's qualification for the job for purposes of the summary judgment motion. Therefore, the only disputed element with regard to Bush's ability to establish a *prima face* case is the fourth element – whether other employees of similar qualifications who

18

were not African Americans received the promotion. This effectively means that Bush must establish that Stepanek was a less qualified applicant. <u>Roh v. Lakeshore Estates, Inc.</u>, 241 F.3d 491, 497 (6th Cir. 2001).

The evidence shows that Stepanek was, at least on paper, markedly more qualified than Bush for the ARRM position. Leaving aside items for which both Stepanek and Bush were comparable (such as demonstrated high quality work), the qualification for the ARRM position included five years of experience, a track record of accounts receivable experience of at least three years, three to five years experience in accounting and collections, and five to eight years in progressive healthcare reimbursement experience.

At the time of her application, Stepanek had over thirty years of experience in the healthcare field, including close to four years as a supervisor of twenty-eight employees at Premier Medical Group. She also was a customer service supervisor at Apria Healthcare[11] for approximately three and one-half years during which she supervised 22 employees, 18 of whom were full-time. She was also a Lead at Apria Healthcare for over a year.

For her part, Bush had accounts receivable experience for the period she worked as a PAR at Gambro and when she worked for Estoerix which amounted to 4 years and 10 months. She had a similar tenure in the area of accounting and collections and healthcare reimbursement experience. As for personnel management,

---

[11]Apria Healthcare was previously known as Abbey Medical. (Stephanek Decl. ¶ 8).

19

Bush's experience was approximately one year when she worked as an account manager for Healthcare Financial Staffing, a temporary staffing agency.

In an effort to show that she was at least as qualified as Stepanek, if not more qualified, Bush points out that unlike Stepanek, who has a high school education, she has a college degree in Healthcare Administration and Planning and a certificate in the same areas. While that may be so, it was not a required qualification for the job. The job posting indicated that the preferred and specialized education was a high school diploma or a GED and Stepanek met this qualification.

Bush also attempts to denigrate Stepanek's qualifications by asserting that Stephanek lacked the required five to eight years of progressive healthcare reimbursement experience. She also argues that while Stepanek had extensive billing experience (which Bush claims "is not listed among the job qualifications for the ARRM position"), she did not have reimbursement experience which is what Gambro was looking for in an ARRM. (Docket Entry No. 64 at 7). There are a several problems with this argument, not the least of which is that Bush has forwarded nothing but her own opinion about whether Stepanek's background met the necessary qualifications.

The evidence before the Court shows that during the period Stepanek worked at Apria Healthcare, she worked regularly in the area of healthcare reimbursement. In fact, her day-to-day duties for approximately ten and one-half years was to either perform personally or supervise everything related to collecting payments.

20

(Stepanek Decl. ¶ 8).[12]   Further, Bush's conclusory assertion to the contrary aside, the position of ARRM required a "proper understanding of billing."

Essentially, Bush is attempting to create a genuine issue of material fact based upon her opinion of her own credentials as compared to those of Stepanek.  She states what she understood to be the job requirements and from there argues that she met the requirements, but Stepanek did not.   However, Plaintiff's "perception of h[er] competence, and the incompetence of those competing against h[er], is irrelevant; the search committee's perceptions and motivations are key."  <u>Wrenn v. Gould</u>, 808 F.2d 493, 502 (6th Cir. 1987).   There is no evidence that the search committee misunderstood the requirements for the advertised position, that they inappropriately judged the qualifications of the candidates, or that they were motivated by an illegal purpose in the selection of Stepanek as most qualified for the job.   The record in this case clearly shows that Gambro (and more specifically Hunter) found Stepanek to be the better qualified candidate.

_____

[12]While these facts are presented in Stepanek's Declaration, Hunter (who was in charge of the hiring) undoubtedly knew these facts since he is the very same person who interviewed and hired Stepanek to work at Premier Medical Group as a Collection Specialist.   Moreover, Stepanek worked under Hunter's direct supervision for two years while at Premier Medical Group. Additionally, Stepanek states, and Hunter confirms, that her qualifications were thoroughly discussed during the interview for the ARRM position at Gambro.  (Stepanek Decl. ¶¶ 17-18).

21

For this reason, the Court rejects Bush's alternative argument that Gambro did not follow its own qualification criteria in selecting the person to become an ARRM. Clearly, Stephanek had more than the basic qualifications Gambro was looking for and to the extent Gambro did not use terms Bush may have preferred in describing the qualifications sought, it suffices to note that "employers are not rigidly bound by the language in a job description" particularly when the position being filled is one in management. <u>Browing v. Dep't. of Army</u>, 2006 WL 126800 at *4 (6th Cir. 2006). There is nothing to prevent Gambro from making its own objective or subjective decision of which candidate is most suitable for the position as long as the decision is not motivated by any illegal purpose, such as racial discrimination.

Even if it is assumed Bush can establish a *prima facie* case, her claim for racial discrimination on the basis of a failure to promote fails because Gambro has articulated a legitimate nondiscriminatory reason for its promotion decision - it believed Stepanek to be the best qualified applicant - and Bush has not produced any evidence that Defendant's stated reason is pretextual.

In an effort to show pretext, Bush merely argues that Stepanek was unqualified. As previously noted, the evidence does not support this conclusory statement.

Bush also argues that Gambro did not follow its own procedures in the selection process of ARRMs.[13] To support her argument, Bush

---

[13]A similar argument is made with respect to the Contractor Administrator positions for which Bush applied.

22

contends that Gambro promoted Kim Green, a Caucasian, to an ARRM position even though Green utilized her Gambro computer to perform school work for an Associate's Degree she earned. Bush asserts that this computer use violated the same policy Bush was accused of violating and therefore, this shows pretext as to the actual reason for hiring Stepanek.

Plaintiff's naked allegation that Green used her computer for personal business has nothing to do with Gambro's decision to hire Stepanek. Furthermore, the ARRM position which Green received was filled in late 2005 and there is no evidence that Bush applied for that position. Finally, Bush conclusorily asserts in her declaration that "Ms. Green was known by management to have violated Gambro's computer use policy." (Bush Decl. ¶ 13). However, there is no factual basis given for this bald allegation. Even assuming it did occur, Bush does not state when Green's computer use was discovered by Gambro, the nature and extent of the alleged misuse, which manager "knew" it, how the manager "knew" it, or whether the manager was a decision maker. In conclusion, there simply has been no evidence presented which would suggest that Bush was denied a promotion because of her personal computer use or that Green's alleged "misuse" of her computer at some point in time, and her subsequent promotion to ARRM, proves pretext on the part of Gambro.

Bush also claims that she can show pretext because Hunter subjectively evaluated the respective candidates on their

23

leadership skills.  However, as the Sixth Circuit recently pointed out:

> reasonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions. Obviously, they will take additional credentials into account, if those credentials would prove useful in performing the job.

Browning, 2006 WL 126800 at *5 (citation omitted).  Given that employers must have some flexibility in making decisions particularly as they relate to management decisions, it is incumbent upon Bush to submit some evidence that Hunter's use of subjective criteria was motivated by an intent to unlawfully discriminate.  Id.  She has not done so in this case.  Instead she merely alleges that Hunter subjectively gauged the leadership qualities of the applicants.  See, Green v. New Mexico, 420 F.3d 1189, 1195 (10th Cir. 2005)(subjective criteria plays a role in management decisions and therefore may serve as a basis to show pretext only where the criteria used by employer are entirely subjective in nature); Denney v. City of Albany, 247 F.3d 1172, 1186 (11th Cir. 2001)("fact that [supervisor's] decisions were based on subjective considerations, such as a candidate's leadership ability and maturity, does not by itself advance Plaintiff's pretext argument").

### 2. Contract Administrator Positions

Gambro seeks summary judgment on Bush's failure to promote claims as they relate to Contract Administrator positions numbers 3830 and 8745 on the grounds that this Court lacks jurisdiction

24

because those claims were not presented to the EEOC. While this Court agrees with that argument insofar as it relates to Bush's claims under Title VII, the argument does not apply to her Section 1981 claim because filing with the EEOC is not required under that statute. Nevertheless, the Court agrees that Gambro is entitled to summary judgment on all of Bush's claims relating to the Contract Administrator positions.

Prior to filing suit in federal court, a Title VII claimant must first present his or her charges to the EEOC. "The purpose of filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law." Davis v. Soexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998). "These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them." Id.

"Recognizing that charges are frequently filed by lay complainants who are unfamiliar with formal pleading requirements, courts will also review any additional claims that 'can reasonably be expected to grow out of the EEOC charge.'" Young v. Daimler Chrysler Corp., 52 Fed. Appx. 637, 639 (6th Cir. 2002)(quoting, Davis, 157 F.3d at 463). "For a charge to grow out of an ensuing investigation, the plaintiff's EEOC charge must, at a minimum, relate *facts* that would prompt the EEOC to consider or investigate other forms of discrimination." Id. (emphasis in original).

25

Hence, "a judicial complaint must be limited to 'the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination,' [and] not . . . tied to the four corners of the one-page form document under all circumstances." <u>Duggins v. Steak 'N Shake, Inc.</u>, 195 F.3d 828, 832 (6th Cir. 1999)(quoting <u>Ang v. Procter & Gamble Co.</u>, 932 F.3d 540, 545 (6th Cir. 1991)).

In this case, any investigation which could reasonably be expected to grow out of Plaintiff's failure to promote claim as set forth in her Third EEOC Charge would necessarily be limited to the ARRM position. The Charge itself is so limiting in that it specifically identifies the denial of the ARRM promotion as the basis for the charge and specifically limits the date of the alleged discrimination to one day, March 12, 2004, when Bush was informed that she would not receive the promotion. Accordingly, Bush has not met the Title VII prerequisites to filing claims with respect to the Contract Administrator positions.

Even apart from the procedural deficiencies under Title VII, Gambro is entitled to summary judgment insofar as Bush's failure to promote claims are based on the Contract Administrator positions. Contract Administrator position 3830 was filled in 2002 and therefore it antedated the January 21, 2004, settlement agreement between Gambro and Bush which settled all claims which could have existed at the time of execution of the agreement. (Alexander Decl. ¶ 8).[14]

_____

[14]Moreover, with respect to this position, Bush compares her qualifications to Anne Marie Huffman who Bush claims was the

As for the second Contract Administrator position, the record reflects it went to Virginia Clunan who, at the time, was employed at Gambro through a temporary staffing agency. Bush does not show that she and Clunan were at least equally qualified since she merely argues that Clunan "had assisted in generating and maintaining legal files but had not studied health facilities law as Bush had." (Docket Entry No. 64 at 11). The fact that Bush had studied health facilities law is not determinative since the educational qualifications for the position were that the candidate have a high school diploma ("some college preferred") and Clunan had both an associate's and bachelor's degree. (Docket Entry No. 68, Ex. 6).

Moreover, even if the two were equally qualified, Gambro has asserted a legitimate nondiscriminatory reason for choosing Clunan - the position which was originally advertised as a full-time position was converted into a part-time position before it was filled and full-time applicants were not considered for the position. (Alexander Decl. II ¶ 4). Bush has not shown this nondiscriminatory reason to be pretextual.

**B. <u>RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (COUNT III)</u>**

In order to establish a *prima facie* case of retaliation, Bush must show: (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant

_____

selected candidate. (Docket Entry No. 64 at 10). However, Huffman was not selected for that position, Nancy Deleon was. (Alexander II Decl. ¶ 6).

thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

With regard to the fourth element which is the only element presently disputed, a plaintiff may seek to show causation through either direct or circumstantial evidence. Shramm v. Slater, 105 Fed.Appx. 34, 41 (6th Cir. 2004). In this case, Bush attempts to show causation solely through direct evidence.

Bush points to the meeting she had with Hines on September 10, 2004, regarding computer use as direct evidence of causation. Bush's own notes of that meeting indicate Hines told her that while he did not have any problems with what she was doing, he was disappointed that she went to outside legal counsel but then stated "[t]his is America and these are your rights." (Docket Entry No. 53, Ex. EE).

28

Bush also points to e-mail correspondence she had with Bishop after she was suspended over the Featherston incident as direct evidence. In his reply e-mail, Bishop stated that he had inquired about the investigation, that it was ongoing, that the outcome had not been determined, and that, while her present suspension was non-punitive and without pay, that could change depending upon the results of the investigation.

Neither Hines' statements, nor Bishop's e-mail constitute direct evidence of causation. The statements require an inference to be drawn in order to prove the existence of a fact, i.e. an intent to retaliate. Vredevelt v. GEO Group, Inc., 2005 WL 1869607 *5 (6th Cir. 2005)(citation omitted). Compare, Nguyen v. Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)("a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent"); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 577 (6th Cir. 2000)(university president purportedly said that "[w]e already have two black vice presidents. I can't bring in a black provost").

Moreover, Bush wholly fails to show an adverse employment action occurred contemporaneously with or near in time to when those statements were made. Nor has Bush shown that Hines or Bishop were in any way involved in any such adverse employment action. She was not disciplined for the misuse of her computer

29

and, by the time she called Bishop, she had already been suspended.[15]

The Court finds that Gambro is entitled to summary judgment on Bush's retaliation claim because there is no genuine issue of material fact as to whether a causal connection exists between her engaging in protected activity and suffering an adverse employment action.

## C. <u>HOSTILE WORK ENVIRONMENT (COUNT IV)</u>

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcome harassment, 3) the harassment was based on the employee's race, 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior. <u>Moore v. KUKA Welding Systems</u>, 171 F.3d 1073, 1078-79 (6th Cir. 1999). A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993). Thus, "the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive

---

[15]The suspension was later changed from paid to unpaid, but, as Bishop noted, the investigation was ongoing and Bush has presented no evidence that Bishop was involved in any way with the change in pay status.

30

work-related environment or adversely affected the employee's ability to do his or her job." Moore, 171 F.3d at 1079.

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23).

In this case, when viewed in light of the totality of the circumstances, Bush cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment or that a reasonable person would have found the environment abusive. The incidents about which Bush complains have not been shown to have been based upon Bush's race, and most cannot even be characterized as harassing.

31

Bush points to a laundry-list of allegations which she says supports her hostile work environment claim, including that (1) she was subjected to meetings with her managers more so than Caucasian employees and in particular wrongfully criticized for the Medicare incident; (2) she was reprimanded for utilizing Gambro computers for non-work related matters and legal affairs; (3) she was unfairly disciplined for the Featherston incident; and (4) she was verbally assaulted by Beyer which caused Bush to have a panic attack.

### 1. **Meetings With Managers and the Medicare Incident**

Bush claims that she was forced to meet with managers more often than her fellow employees and further claims that, on at least one occasion, she was told to come to a meeting but not told in advance who would be attending the meeting. (Docket Entry No. 64 at 19). Bush's argument must fail because there has been no evidence presented, other than her supposition, that Caucasians have not been subjected to meetings with management.

Relatedly, Bush claims she was unfairly criticized regarding the Medicare incident given that other PARs had also sent e-mails stating Medicare had told them to "F9" the claims. However, there is a total dearth of evidence which would suggest that any other PAR persisted in sending e-mails to managers and other PARs after being instructed by management (through the e-mail from Clingerman) not to try to "F9" the claims. Hence, it cannot be said that this "harassment" occurred as a result of Bush's race.

32

### 2. **Use of Gambro's Computers**

Bush claims she was reprimanded for using her Gambro computer for personal matters and told that her computer use would be monitored. She asserts that while others also used their work computers for personal matters, they were not similarly disciplined.

Again Plaintiff lacks proof to support this claim other than her unadorned assertion that she does "not know of" and has "not heard of" others being similarly disciplined. The fact she does not know of or has not heard of other incidents is not competent proof. There is no competent evidence that others were not "disciplined," or any evidence that other employees used their computer for personal matters to the extent that Bush did.

As for use of the computer to communicate with her attorney, the record reflects that she was told to utilize her computer during her break periods. She claims, however, that co-worker Conviser "repeatedly used her Gambro computer to discuss legal affairs with an attorney," (Docket Entry No. 64 at 20) but was treated differently in that she was not told to limit her computer usage to discuss matters with her attorney. However, the only evidence Bush submits to support Conviser's wrongful use of her computer is an e-mail from Bush in which she asks Conviser what attorney she had used for her divorce. Conviser briefly responds to Bush's e-mail by informing her of the attorney's name. This does not compare with the repeated exchanges between Bush and her

33

attorney Danner about substantive subjects, including questions and comments, over a number of days.[16]

### 3. **The Featherston Incident**

Bush suggests that her suspension for the Featherston incident is evidence of harassment. It is unclear how she reaches this conclusion. In any event, the record does not suggest Bush was treated any differently than others because of her race.

While Bush maintains she never called Featherston a rat or a bitch, the record reflects that an allegedly disinterested third party witness confirmed Featherston's account of the incident. Bush can point to no other individuals who engaged in the same conduct (i.e. being confrontational and utilizing pejorative terms to describe a fellow employee) who was treated differently.[17] Thus, Bush has not shown her discipline for the Featherston incident was harassment based on race.

_____

[16]Hines' statement that he wished Bush had not gone externally regarding her complaints adds nothing to Bush's harassment claim since her own notes of the meeting show that Hines recognized her right to pursue legal matters.

[17]Bush claims that Connie Gibbs engaged in inappropriate and unprofessional conduct but was treated differently in that Gibbs was suspended with pay. Leaving aside that this contention is in direct contrast to Bush's admission that she was not aware of any white employees who were treated better than she was after engaging in conduct similar to the Featherston incident (Def. SOF ¶ 50 & Pf. Resp.), the record shows that the conduct did not involve foul language or confronting co-workers in a hostile manner. Further, the investigation was inconclusive regarding Gibbs' culpability. (Alexander Decl. II ¶ 3; Docket Entry No. 68, Ex. 2).

**4.  Beyer's Verbal Assault**

Plaintiff claims she was subjected to a hostile work environment when she allegedly suffered a panic attack after Beyer clapped her hands and told her to "do the math" in relation to the Medicare incident.  As indicated, this has not been shown to be race-related since there has been no showing that any of the other PARs attempted to countermand Clingerman's instructions.  Moreover, managers are not required to always refrain from expressing any sort of emotion at the risk of being sued for discrimination.

In this regard, as well as the other "evidence" Bush presents in support of her harassment claim, this case is wholly distinguishable from the Sixth Circuit decision in <u>Hafford v. Seidner</u>, 183 F.3d 506 (6th Cir. 1999) upon which Bush heavily relies.  In <u>Hafford</u>, the Sixth Circuit ruled that the district court wrongfully dismissed a race harassment claim where the summary judgment record showed that plaintiff's supervisors and fellow workers "engaged in a pattern of racial harassment consisting of not only racial slurs, but also physical threats." <u>Id</u>. at 513.  The racial slurs were particularly offensive and egregious and the threats included death threats and a reference to lynching.

Here to the contrary, Bush has presented nothing which suggests that the actions about which she complains were taken because of her race, that the actions were particularly harassing, or that the actions made her working conditions abusive or intolerable.  She certainly has not shown that the acts were

35

pervasive enough to create an environment that a reasonable person would find hostile or abusive. While "mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility," id., this Court cannot conclude a rational jury could determine Bush was subjected to a hostile work environment based upon her meager complaints and unsupported conclusions. Accordingly, Gambro is entitled to summary judgment on Bush's hostile work environment claim.

**D.   REMAINING DISPARATE TREATMENT CLAIMS**

In her Complaint, Bush sets forth many of the foregoing incidents as support for her claim that she was treated differently than others because of her race. While Gambro has moved for summary judgment on any claim of disparate treatment (including the disparate treatment claims relating to the denial of promotions), Bush's response addresses only the denial of promotions as a disparate treatment claim. Nevertheless, this Court has reviewed the Complaint and, for many of the reasons already stated, finds no disparate treatment claims which are capable of surviving summary judgment.

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race[.]" Huguley v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive," id., and this may be shown either through direct evidence or indirect evidence utilizing the burden shifting

36

paradigm already discussed. Bush presents no direct evidence of disparate treatment and hence she must show membership in a protect class, an adverse employment action, qualification, and dissimilar treatment to one similarly situated. Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).

With respect to most of her disparate treatment allegations, Bush can show no adverse treatment. Adverse action requires a showing of a material adverse change in the terms and conditions of employment which are more disruptive than a mere inconvenience and constitute such things as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 662 (6th Cir. 1999)(citation omitted).

Bush spends much time discussing the Medicare incident but admits that she was not formally disciplined over that incident, and has not shown that she suffered any other type of adverse employment action as a result of that incident. Similarly, with regard to her use of the computer for personal work, Bush was not disciplined and she suffered no loss of wages or diminution in job duties. Likewise her conference with Hines related to that incident did not serve as a basis for any adverse action.

Apart from her failure to promote claim, the only evidence Bush sets forth which shows an adverse action is her suspension as a result of the Featherston incident. However, Bush cannot

37

establish a *prima facie* case of disparate treatment based on this incident because she cannot identify a similarly situated individual who engaged in substantially identical conduct, <u>McMillan v. Castor</u>, 405 F.3d 405, 413 (6th Cir. 2005) that was treated differently. Even if Bush could establish a *prima facie* case, as has already been explained, Gambro has advanced legitimate nondiscriminatory reasons for its actions which Bush has not shown to be pretextual. Accordingly, no jury question is presented with respect to any claim of disparate treatment.

## IV.  CONCLUSION

On the basis of the foregoing, the Motion for Summary Judgment (Docket Entry No. 51) filed by Defendant Gambro Healthcare, Inc. will be granted and this case will be dismissed.

An appropriate Order will be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

38